You will hear argument next in Case 2016-41, Marietta Memorial Hospital Employee Health Benefit Plan v. Davita Inc. Mr. Kulowitz. Mr. Chief Justice, and may it please the Court, for four decades the Medicare Secondary Payer Act has been a coordination of benefits statute. It establishes that a group health plan must pay its benefits first during a 30-month coordination period when the plan and Medicare both cover an individual who must contend with end-stage renal disease. The plan must not take into account the Medicare entitlement or eligibility of an individual during that time or differentiate in the benefits that it provides between individuals with end-stage renal disease and other individuals covered by the plan on a basis that relates to that diagnosis. The Sixth Circuit has determined that there also is an implied mandate that dialysis providers occupy a specific position to be determined relative to providers who serve other vital health care needs of the 157 million American people who depend upon group health plans to defray the costs of their health care. When Congress requires a specific benefit or parity between benefits, it does so directly. It did not do that here. The Medicare Secondary Payer Act coordinates benefits. It does not prescribe them. The plan at issue in this case provides the same benefits uniformly to all participants and as primary payer during the 30-month coordination period. Respondents fail to state a claim under the Medicare Secondary Payer Act. Because the alleged violations of the Medicare Secondary Payer Act are the express and only basis of their ERISA claims, respondents also fail to state a claim under ERISA. The Court should reverse the Sixth Circuit and enter final judgment in favor of petitioners on all remaining claims. I welcome the questions of the Court. Doesn't your approach permit the differentiation or some differentiation between sort of high-cost services that are used by a certain segment of the population? I think that's the argument here, that you have a lot of people who are not in a good position to pay who are being charged an amount that they're high usage, they're poor, and they can't pay the cost. And it seems as though your approach targets that group. Your Honor, the approach that this plan takes is actually to minimize the actual out-of-pocket payment that the participants in any situation who are receiving dialysis will make. What this plan does, by tying the benefit, by making the allowable charge the Medicare base rate and paying it 125% of that, that means that the plan pays 70% and the individual pays 30%. So what's the disagreement? The respondent does not agree with that assessment of your approach. Yes, Your Honor, that's correct. What the respondent seeks in paragraph 67 of this complaint and amended complaint on pages 32 and 322 of the respective appendices is that they have a right to be paid under the Medicare Secondary Payor Act their full undiscounted charges, because that is the only way to eliminate the specter that they hang out there of balanced billing. But what that would mean for the participant is a participant who's been paying 30% of 125% of the Medicare rate, which is $257 this year. So the participant will be paying roughly $96 per treatment. But if the court grants the relief ultimately that the data seeks, that same individual will be paying 30% of, according to the Pacific Health Coalition amicus brief, the dialysis charges range from $1,041 to $6,000 per treatment. So that same participant, instead of paying $96 per treatment, will be paying up to $1,800 per treatment. Thank you. Thank you. Just a factual question. Is Marietta Memorial Hospital one hospital, like one big set of buildings? Yes, Your Honor. So Tier 1 applies to people who go to that set of buildings. That's right. And does that set of buildings or Marietta Memorial provide the service of outpatient dialysis? No, it does not, Justice Breyer. There is, you know, it says an exception in the thing where it says Tier 2 will charge Tier 2, even if you get outpatient dialysis in the Marietta Hospital. But that exception has no application, I take it. Well, if a patient with ESRD is hospitalized for some reason and receives dialysis at the hospital at a Marietta Hospital. But that's inpatient. That's inpatient. That's reimbursed at the Tier 1 rate, Your Honor. Yes. Reimbursed at the Tier 1 rate. So the Tier 2 rate right now, anybody? Okay, good. I'll ask the other side. Thank you. Counsel, does this plan, as designed, encourage people to get on Medicare? Your Honor, this plan is decision neutral as it pertains to. Well, it's not really decision neutral. Those people who don't have Medicare can be balanced bills, correct? And so they really are encouraged, I put the words, to join Medicare? If they enroll in Medicare for Part B, Your Honor, there is a prohibition against balanced billing. Right. So if they're not, then you can balance bill. That's for an individual who's just coming in. I ask that question only because it's a very complex area. You're going against the Medicare purpose of ensuring that the public fist is not dipped into until necessary. But this process is forcing those non-Medicare people to jump into Medicare as soon as they can. Well, Your Honor, CMS itself unequivocally encourages people in this sort of a situation to enroll in Medicare for the reasons that Your Honor has pointed out. And secondly, the Medicare Secondary Payer Act, by definition, contemplates that plans will pay a rate, that plans may pay a rate below the Medicare base rate. Now, there is one big difference in benefits here. And for me, it is, it seems like the Tier 1, Tier 2, and I could be wrong, you can correct me, for everything else besides this condition says that it will pay a certain percentage of the reasonable and necessary cost of a service. Am I correct? Well, Your Honor, technically the plan says it will pay the reasonable, reimburse at the reasonable and necessary cost of all services. It's just with respect to Medicare and 10 other services, by the way, there are reference-based prices. So why isn't the fact that this is a differentiation of the general standard of paying benefits, the general standard is a percentage of the reasonable and necessary cost. But with respect to ESRD, you limit it to a cap. Why isn't that cap? We pay the same, I'm sorry, Your Honor. Yes. We pay the same percentage reimbursement for Tier 2. It is treated as a virtual Tier 2 benefit. The only difference is that rather than accept what the respondents say is a reasonable and customary rate because they are operating in a dysfunctional, monopolistic market, so we base the reimbursement on the Medicare rate. But that's still a different way of treating people. So why isn't that on the face of the statute? Your Honor, because what the statute, what the Medicare Secondary Payer Act requires is that a plan not differentiate in the benefits that it provides between individuals with end-stage renal disease and others covered by the plan. The benefits here, the dialysis benefits are available to every individual covered by the plan for any purpose. Can I ask you, I mean, maybe just state the question at a completely abstract level first. If there's a law that says you can't differentiate between Group X and Group Y, right, and you don't differentiate quite between Group X and Group Y, you just find a perfect proxy, a perfect proxy that ends up distinguishing between Group X and Group Y. So you change the words, but 100% of the people with this proxy characteristic are Group X, and 100% of the people with this proxy characteristic are Group Y. Are you in violation of the differentiation provision or not? What you would do in that situation, Your Honor, under the auspices of the Medicare Secondary Payer Act, is you would look at the first group in Your Honor's hypothesis, if they all are, and bearing in mind the statute says individuals with end-stage renal disease. If that is a common denominator among that class, then you go to the next element of the statute. Is that differentiation on account of the existence of end-stage renal disease? Is it on account of that individual's need for renal dialysis as opposed to the other treatment there? I guess I'm not really quite understanding what you're getting at, so now we'll just go to the case. I mean, it doesn't take much of a change in the numbers to be a perfect proxy. I mean, these are like 99% and 97%, but let's say you had 100% and 100%, meaning that 100% of people with end-stage renal disease need dialysis, and 100% of the people who need outpatient dialysis have end-stage renal disease. Suppose it were 100% to 100% as opposed to what it is, which is 99.5% and 97%. Let's just round up and say it's 100%. Now, when you differentiate between people on the basis of end-stage renal disease, you say, well, we can't do that. We'll just differentiate on the basis of the treatment that they all need and that only they need. That would be a different situation, of course. Before you tell me why it's different, in that situation, have you violated the provision? Your Honor, if there is a 100% complete identical overlap, then we are back in the situation that the statute prescribes. Back in the situation that the statute proscribes, prohibits. You would be in violation of the statute. Is that what you're saying? Well, if. I'm just asking. I'm just trying to get it clear. If my hypothetical is right, you're in violation of the statute. Not necessarily, Your Honor. You were just in violation of the statute 10 seconds ago. Because, Your Honor, there's more to it than that. That's the first question that you asked. I just want to know the answer to that first question. 100%, 100%, are you in violation of the statute? No. No, Your Honor, because there's more to it than that. What the Medicare Secondary Payer Act says is that if that situation exists, if you have, whether it's a 100% overlap or straight out end-stage renal disease, if they're all on one side, if the benefits that they have under the package are different, it's 100% on that side, then you go to the on the basis of qualifying phrases. Are they on there because on the basis of their end-stage renal disease or the need for renal dialysis or in a related manner? Bearing in mind, there are a number of utterly lawful and reasonable classifications of plans. A plan can differentiate in the benefits made available based upon seniority, collective bargaining status, geography. I mean, we could go down a list of these kinds of diseases with these kinds of treatments that are always necessary for that disease and only used for people with that disease. You know, we can do diabetes type 1 and insulin, or we could do antiretrovirals and AIDS. And these are, you know, you understand why people don't want to pay for these things. They're expensive. But isn't that exactly what Congress was trying to do? It's saying stop trying to get out of paying for the only treatment that is appropriate for a particular disease. And now you say, well, we can do that. We just don't have to use the words end-stage renal disease. You know, Congress legislated both an objective and a means. The objective plan was to protect the Medicare FISC after the usage of the Medicare benefit had grown exponentially over original projections. But then the means by which you said it required the plans to do that are not taken into account during the coordination period but not differentiate in the benefits that it provides between individuals with end-stage renal disease and others covered by the plan. So you could use- So I take that answer to be something along the lines of, and this is possibly right, we have found a perfect end run around the statute. But, you know, sometimes statutes have perfect end runs, and if the statute doesn't prescribe it, too bad. What the text of this statute pertains to, Arturo, is distinctions between individuals, not distinctions between services. If we look to the clear text of the statute, it says what it says and does not say what it does not say. What the statute says is- I mean, we could go through a whole host of these. Mr. Waxman has a lot of them in his brief. You know, if you say you can't differentiate between Orthodox Jews and everybody else and then you have attacks on yarmulkes and kosher food, are you doing that differentiation or not? Well, of course, in the Bray case, what the court did was to reject that sort of a classification as a basis for a de facto invidious discrimination. What this plan does, Your Honor, it's essential, it's vitally important to the case. This plan provides exactly the same benefit to every individual in the plan. There is no differentiation in the benefits made available. What the Medicare Secondary Payer Act measures is, is there a difference between the benefits provided to the individuals? I want to make sure I understand your answer because, obviously, Justice Kagan's line of questioning is very important, and I want to know if you rely on the statutory language in your answer to her and whether that's how the statutory language should be read because the practical result, obviously, is not one that I think the people writing the statute would want to sanction if it's the exact same result. But the statute says whether, it turns out whether or not the health plan takes no notice whatsoever of whether the claimants are eligible. So even if, for example, it's 100% proxy between people who are over 6 feet tall and, you know, people who have blue eyes or whatever, and you cannot take account of how tall they are, is it really the case that you would be fine so long as you just asked if they had blue eyes or not? That's an odd, medically an odd suggestion, hypothetical. But my point is you could have, there could be 100% proxy, but you only take account of the one feature. Does that give you an out? Well, in response to Your Honor's first question, we rely specifically on the text of the statute. And what Congress did here is when it wrote the text of the statute, it used classifications that are laser focused on the congressional purpose. The congressional purpose was to temper the overruns from estimates of what the Medicare eligibility was going to cost, and that's people who are entitled to or eligible for Medicare on the basis of an ESRD diagnosis. So that's exactly the classification that it used in the statute. It is the one perfect overlap here because it overlaps directly with the objective of the Medicare Secondary Payer Act. So you're disagreeing with both circuits, the ninth and the sixth here. Both said if you differentiate and pay less for a drug that's used only for ESRD patients, that's okay. They said that's not okay. That's a proxy, basically. But both circuits agreed that would not be okay. And the ninth circuit also accepted the proposition that this wasn't a proxy because there were some non-ERSD patients who had acute kidney conditions that were receiving the same benefits. But if the other side is right, that all those people are treated in hospital, so that we go to Justice Kagan's hypothetical, that this really is 100% ERSD patients, you're saying you're not violating? Of course, Your Honor, the other side is not correct in saying that there is a correlation there. Ever since the Trade Preferences Extension Act of 2015, there is no correlation. People with acute kidney injury go to outpatient dialysis. People with end-stage renal disease can get inpatient dialysis when they're in a hospital. The ninth circuit and the sixth circuit, the difference between the ninth circuit and the sixth circuit is the ninth circuit stuck with the statutory text, honored the statutory text, read it verbatim and literally. The sixth circuit has expanded upon that in a way that goes far beyond what the text would allow. Why does this not violate the statute from your point of view? I think it obviously doesn't, what I'm about to say, but I want to know why. Every single ESRD patient gets outpatient dialysis. So the insurance plan says you're going to get 90% of the cost back. If you have a heart attack, however, you get 95% of the cost back. Why doesn't that violate the statute? So long as that benefit package was available, Your Honor, to everybody covered by the plan, it would not violate the statute. Look, it's only the ESRD patients that get 90%, and the heart attack patients get 95%. Why doesn't that violate the statute? I misunderstood, Your Honor, hypothetically. If there were a condition that singled out patients with ESRD and differentiated in the benefits to ESRD, if there was some distinction between the benefits available to a patient with ESRD and others covered by the plan, then the issue would arise under the differentiation. It seems to me there are 10,000 different diseases, and I can't believe that insurance plans cover them all the same. Right. Do they? Which is exactly one of the problems with it. Okay. So then my question was, if you give ESRD patients 90%, but you give people with the common cold 99%, you give people with heart attacks 83%, why doesn't all that violate the statute? Your Honor, because the statute contains no requirement of any particular benefit. The Medicare Secondary Payer Act does not prescribe any particular compensation. So your answer, Justice Kagan, then, is even if there are everybody that gets outpatient renal dialysis has ESRD, everybody, and we give everybody 62% of the charge, all those ESRD, and we give some other person with a heart attack more, that doesn't violate the statute, because everybody getting ESRD is getting the same. That's correct, Your Honor. Are you sure that's correct? Your Honor, that package of benefits, if I understand Your Honor's hypothetical correctly, is one that would be applied uniformly, the same package of benefits applied uniformly across a plan in the context of a statute that has no requirement of any specific benefit. I need to understand it from your point of view, and then I want to see what Mr. Waxman thinks. Thank you, counsel. Justice Thomas, anything further? Justice Beyer, anything further? Justice Alito? Well, I'm somewhat baffled by this statutory language. In 1395YB1C, I start out sort of understanding it. The plan may not differentiate in the benefits it provides between individuals having ESRD and other individuals covered by such plan on the basis of the existence of ESRD. All right. I can understand that. But after that point, a group health plan may not differentiate in the benefits it provides between individuals having ESRD and other individuals covered by such plan on the need for renal dialysis. What does that mean? In what sense is it different from what I just read? Because what that means is if the reason that the different package of benefits goes to the patients with ESRD, if the reason for that is because of their need for renal dialysis, then that would constitute a claim under the Medicare secondary payer. What does that add to the language that came before it? Your Honor, it adds several things. If a plan were to say that it would cover individuals who need kidney transplants but there was going to be a separate package of benefits for individuals who needed renal dialysis, that, of course, would be one of the distinctions it would address. But overall what it addresses is if the plan differentiates in the benefits between individuals with end-stage renal disease and others on the basis of the need of the individual with end-stage renal disease for renal dialysis, then that would constitute a violation of the statute. I thought the first clause meant that if you have people with end-state renal disease and you have to treat them the same way, give them the same benefits as other people who are identical except for having ESRD. That's right. I think I can address Your Honor's concern. So the first qualifying phrase, differentiate on the basis of the existence of end-stage renal disease, that would be a plan that said benefits are different just by virtue of having end-stage renal disease. Right. The second scenario is it would be different based upon the need of somebody with end-stage renal disease for renal dialysis as opposed to a case. Okay, so you have somebody with end-state renal disease who needs dialysis and you're comparing that person to whom? To other individuals covered by the plan. Who don't need renal dialysis? No, so a person with acute kidney injury would need renal dialysis, Your Honor. That's what was addressed by the first language. It's two separate scenarios, Your Honor. What the first clause would identify or would address is a package of benefits that's different simply because the individual has end-stage renal disease. That would not include persons with acute kidney injury. So then the second, because that's not an end-stage situation, the second qualifying phrase would address people with end-stage renal disease who need renal dialysis. If that were the basis for differentiation of the package, there would be issues under the Medicare Secondary Payer Act. And then we get to the third part, may not differentiate in the benefits it provides between individuals having ESRD and other individuals covered by such plan in any other manner. What does that mean? Your Honor, what that means is any other manner related to the ESRD diagnosis under the Houston Generis Canon of Statutory Construction, where we have a general words follow a series of specific words. They don't necessarily relate to the condition that the limiting words address. So in any other manner, in any other related manner, for example, if a plan said that benefits will be differentiated for those who need manual removal of waste products and excess fluid from the blood, that would be synonymous. They're related to the end-stage renal disease. That would constitute a violation. They each serve a separate purpose. The first relates to the condition. The second relates to one of the therapies. The third relates to differentiation on the basis of the diagnosis in general. Okay. Well, I won't ponder all that. There are various categories of entities and people who might be financially affected by the outcome here. There are the group health plans. There are the two companies that provide dialysis, or basically two companies that provide dialysis. There's Medicare, and there are the people with ESRD. To what extent are people in the latter category going to be affected by the outcome? Your Honor, if the court were to affirm the Sixth Circuit, and it goes back, and the judgment is entered for what the VEDA seeks here, which is the right to be paid for undiscounted charges, it would be disastrous for people who have end-stage renal disease and are covered simply by plans, because that would be a situation where right now they're paying 30% of 125% of the Medicare rate, which would be in the $90 range, $96 range. Paying 30% of the undiscounted charges could be up to $1,800 per treatment, and now very quickly exhaust resources and reach their out-of-pocket maximum within the space of two to three treatments here. And it would be equally catastrophic for plans, because it would absorb resources that are needed to cover other vitally important health conditions as well. I'm sorry. Okay, so it would be just one more follow-up. So if you were to lose, it would be bad for your client, bad for other group plans, bad for the people with end-stage renal disease, but good for Mr. Waxman's client and for Medicare. Your Honor, I don't think I heard the end phrase. And Medicare. No, I don't think it would be good for Medicare either, Your Honor, because what would happen in that situation, one can easily imagine a mass migration out of group health plans straight into Medicare, which is exactly the situation we're trying to avoid. Patients right now who are paying on an allowable cost basis with a reference-based price, in particular the Medicare price here, they're paying a much lower rate. They're actually out-of-pocket. I know that there's a specter of balanced billing, but the important thing to remember about that is that's a function. The only thing that we can do, that the petitioners can do to avoid balanced billing, is to pay the full undiscounted charge because then at that point there's no bill left over. We could pay a 750% of the Medicare rate and there would still be a balanced billing. But that is something that is exclusively within the control of respondents. And unless the Medicare Secondary Payer Act is going to be construed as something that gives a compulsory duty to group health plans to do everything they can to stop dialysis providers from inflicting the harm they can inflict through balanced billing, which I don't think is a result that Congress has ever contemplated or would bring us here, they're going to be in a very precarious position, the individuals. Thank you, counsel. Justice Sotomayor? Justice Sotomayor, what forces the dialysis companies to limit what they're charging the patients? You're limiting what you're paying the patients, but what limits them? Medicare limits them. You accept Medicare, which they have to basically for this. They can't charge more than Medicare permits and they can't balance. But what stops the companies from charging patients whatever they want? Nothing, Your Honor. Exactly. The only situation in which they can not charge, in which they're bound by the Medicare rate is when the individual, or affected by the Medicare rate is when the individual has enrolled in Medicare. Why does your system help patients, meaning your system stops them from paying for you giving them that little extra money, but it doesn't stop them from being charged for the real cost of the treatment and not getting anything for it? Well, the real cost of the treatment, of course, is $242. No, that's what you're paying. Well, no, we're paying based on $332, which is 125% of the Medicare rate. No, no, no. My point is if they charge $5,000 for treatment, you're limiting it to $200. The patient is not saved. They still have to pay the $5,000 minus the $200 you're paying. They would have to pay the balance of the $5,000, Your Honor, only if DaVita exercised its right to balance bill there. It does not, and notably in this case. Yes, but the point is that you're not helping the patient in those situations. The only way that we can avoid balance billing, Your Honor, in a situation where DaVita will not come in network, and notably there's no allegation in this case that DaVita has ever sought to come in network or wants to come in network and has been denied the opportunity to come in network, the only way that we can avoid balance billing would be to pay on the basis of the full undiscounted charge, which would put the patient in a much worse position because right now they're paying 30% of 125% of the Medicare rate. Then they would be paying 30% of up to $6,000 per treatment. Thank you, Counselor. Justice Kagan, anything further? Yes. I'd like to go back to where Justice Alito was taking you about the exact language of this statute, and it is a confusingly written statute, but here's a theory of it. So first it says you're not to differentiate between individuals having end-stage renal disease and other individuals in the plan. All right? Right? In the benefits provided. Yes, yes, yes, in the benefits provided. Now, when it says on the basis of the existence of end-stage renal disease, that's completely redundant because if I tell you not to differentiate between people with end-stage renal disease and those without end-stage renal disease, I'm obviously telling you not to distinguish based on the fact that they have end-stage renal disease and they don't. Right? That's just redundant. Well, Your Honor, may I push back with an alternative hypothetical? No, definitely not. All right. I mean, you can push back. You know, I'm not saying you can't push back at some point, but I think what I just said is pretty obviously true. All right. Now it goes on. You also can't distinguish on the basis of the need for renal dialysis. Right? Now, what does Congress mean when it says that? And it's not particularly precise and it's not particularly grammatical, but why is that there? It's there because they know you're going to do exactly what you're doing. It's there because they're saying, don't try to distinguish between those with end-stage renal disease and those without end-stage renal disease by finding the perfect proxy, which is the therapy rather than the condition. So that's why that's there. And then, in any other manner, in case there's a proxy that we haven't thought of, don't try that one either. So altogether, this is basically saying you can't distinguish between people with end-stage renal disease and those without. You can't do it directly. You can't do it by means of the fact that this group needs dialysis and this group doesn't. And you can't do it by finding any other proxy that perfectly separates these two groups. Well, Your Honor, we respectfully disagree. And maybe if I can give a hypothetical, it might cast it in a different light. Say that a plan said that there would be one set of benefits for people in North Dakota and another set of benefits for people in South Dakota. And it just so turns out that the people in South Dakota, some of the covered individuals, the only individuals covered by the plan who have end-stage renal disease are in South Dakota. So they would raise, understandably, they would raise an issue and say, hey, I've got end-stage renal disease. My benefits are not the same as the people in North Dakota. Why is that? And so that's when we go to the first, second, and third elements of the clause. Is it because I have end-stage renal disease? The plan may say, no, it's because this is on the basis of geography. The laws in North Dakota are different from the laws in South Dakota. Or, no, it's on the basis of collective bargaining. The people in North Dakota are in a bargaining unit. The people in South Dakota are not in a bargaining unit. It may be on the basis of full-time, part-time current employee, former employee. So it's not a redundant appellation there in that case, Your Honor. It's not just because there is a – Is there some relevance to this case? No, actually – I mean, how do you – Because the benefits in this case are applied. The same benefits are applied uniformly across the board to every participant in the plan. There is no differentiation. I mean, that's like Anatole France in Sleeping Under the Bridge and the poor and the rich alike, right? No, Your Honor. It's a – It's applied to everybody. Well – Even those people who don't have any use for dialysis. What the law that Congress gave us says is that a plan may not differentiate in the benefits that it provides between individuals with end-stage renal disease and others covered by the plan. Based on the need for renal dialysis. Well, and you get to that if there's a differentiation, but there has to be – your threshold question, Your Honor, is, is there a differentiation in benefits here? And if there is no differentiation in benefits, if everybody in the plan has the same benefits, then the qualifying process – I'll just say it again, maybe more briefly than I said it before, just in case it's a problem of communication on my end. But this based-on thing, this based-on thing is supposed to tell you not to do exactly what you're doing. This based-on thing is saying don't do it based on the condition itself, don't do it based on the therapy, and don't do it based on anything else that is a proxy for the condition. But what it is saying not to do, Your Honor, is to differentiate the benefits between individuals here. It is not – it does not prescribe any benefits. It does not prescribe parity of benefits. Okay, is this your point? I mean, I promise I'm almost certainly wrong, but I've had a really hard time grasping it. You're saying that if there is a human being in this plan, whether he has end state or not, and if that individual, should he get end state, would be treated worse, that is covered by this language. If the end-stage venial disease diagnosis – Let me say it again if you didn't get it. Did you get it or not? I believe I do, Your Honor. Okay, then am I right or wrong? If the diagnosis ends up with differentiation of benefits, then there would be – it would stay a claim under the Medicare Secondary Payer Act. I'm trying to figure out what other – is Justice Kagan correct? That's one possible reading. And I'm trying to see – you think she's not, so I'm trying to figure out what your reading is, okay? Mr. Smith, who has a heart attack, or Mr. Smith, who has your plan, should he, Mr. Smith, get end state renal disease under the plan, he won't be treated as well as all the other 98,000 people who have end state. That would violate it. Yes, Your Honor. If that diagnosis changed his – operated to change the plan benefits available to him, that would – Change it? It would change – you're saying your plan doesn't do that, but if we had the imaginary plan that did do it, should Mr. Smith get end state renal disease next year, he will be paid by your insurance company at a lower rate than the 980,000 – or the 300,000 people who now have end state renal disease. That sounds to me like it would be a differentiation, Your Honor. Okay, so now I see what you're saying. Maybe I was the only one who didn't understand what you were saying, but now I think I do. Thank you. Thank you, Your Honor. Justice Gorsuch, anything further? Kamenow? Justice Barrett? Thank you, counsel. Thank you, Your Honor. Mr. Garnieri, I understand you're with us remotely. I am, Your Honor. You may proceed. Thank you. Mr. Chief Justice, and may it please the Court, the Medicare secondary payer statute does not forbid group health plans from adopting uniform limits on coverage for renal dialysis. Fundamentally, the nondifferentiation provision forbids only arrangements under which a group health plan provides different benefits to individuals with end stage renal disease and other individuals covered by the plan. Petitioner's plan does not do that. Respondent's proxy theory is, therefore, irrelevant. This plan is not providing a different package of benefits in the first place, by proxy or otherwise. Now, it's true that uniform limits on dialysis principally affect those who need dialysis the most, but this statute also does not impose disparate impact liability. Respondent's contrary view is inconsistent with the text, purpose, and history of the statute and would be unworkable in practice. This statute serves an important but limited function in coordinating benefits between Medicare and group health plans. It does not entitle dialysis providers to any particular level of reimbursement. I welcome the Court's questions. Counsel, there's been some discussion about the effects of the different positions that have been taken on interpreting this statute and this payment differentiation problem. What do you think the effects would be? Justice Thomas, we are concerned, frankly, about the effects that this decision may have. The provisions in this statute have been in substantially the same form since 1989, and CMS is implementing regulations, including a regulation that expressly permits plans to impose uniform limits on coverage for dialysis. Those regulations have been on the books since 1995, and we haven't seen the sky falling. We haven't seen many examples in which plans have engaged in creative ways to try to circumvent the statute, but certainly a decision from this Court could bring renewed prominence to this issue, so we don't take those policy concerns lightly. Of course, Medicare itself is available as a backstop care. The whole design of this statutory scheme is that individuals who develop end-stage renal disease, after three months of dialysis, they are eligible to enroll in Medicare, and during the 30-month coordination benefits period, Medicare is there if they would like to enroll in Medicare and pay for Part B. Medicare is there to cover any potential gaps in the coverage that the group health plan provides. Thank you. Counsel, what is your response to Justice Kagan's line of questioning about proxies? If you have somebody that's a 100% proxy, it does not take, whatever it is you're not supposed to take, Medicare eligibility into account at all, but it just turns out that the group is the same as it would be if it did take the Medicare into account. Sure. Again, as I said at the outset, I don't think the proxy theory is really sufficient for respondents to prevail in this case, and that's just a result of the plain text of the statute. Section 1395YB1C Roman 2 states that group health plans, quote, may not differentiate in the benefits it provides, a group health plan, may not differentiate in the benefits it provides between individuals with end-stage renal disease and others covered by the plan. And if a plan is providing the same package of benefits to all individuals who are covered by the plan, which is what the petitioner's plan does, then it is not differentiating in the benefits it has provided, and therefore it is not violating this specific provision. And so there's no occasion arises to inquire into whether the plan is drawing a line among plan participants on an impermissible basis or as a matter of a proxy for an impermissible basis because there's no improper line drawing in the first instance. And how about my view of the statutory language, which does suggest that the statutory language itself indicates a concern that proxies will be found and attempting to really cut that off at the pass. In other words, you know, don't distinguish between these two groups, people with ESRD and those without, based on the fact that they have the disease or based on the fact that they need renal dialysis or based on some other proxy you can come up with. Just don't do it at all. I take the point, Justice Kagan, and in some ways that's another reason. I mean, the statutory text itself here furnishes an additional basis that you don't need to kind of import into this coordination of benefits statute the concept of proxy discrimination drawn from an opposite body of federal civil rights law. It's interesting that that back language, Mr. Gordieri, is the kind of don't think you can end run this language. That's what that language is there for. Well, but Justice Kagan, that language all follows after the actual prohibition in the statute and it is a prohibition against differentiating in the benefits that are being provided. And so if a plan is not doing that, if a plan is providing all individuals covered by the plan, regardless of whether or not they have end-stage renal disease and regardless of their need for renal dialysis with the same package of benefits, meaning the same items and services are covered at the same premiums and any other sort of cost sharing with individuals, then the plan is not violating this specific provision. Yeah, I think what most confuses me about this case, Mr. Gordieri, is why you're on this side of it. I mean, it just, you know, I hate to say the obvious, but usually the government is concerned about the state of government finances. And aren't you clearly going to end up paying more if the petitioner wins than if the respondent wins? That may well be the case, Justice Kagan. And again, as I tried to say, as I tried to stress in response to Justice Thomas' question, I mean, we take these policy concerns lightly. We don't think the policy – I'm sorry, we don't take them lightly. We just don't think in this instance that those policy concerns are sufficient to overcome the best reading of the statutory text. I'm moved by your adherence to – I'm sorry, it's so hard to do this with you not up here, Mr. Gordieri. But, you know, I'm sort of moved by your adherence to principles of statutory interpretation. But, you know, usually, I mean, the government, you know, fights for the government's interests, especially when there's sort of such an obvious counter-argument to your statutory argument. I mean, I keep on thinking – Justice Kagan, it's a principle that we are here to vindicate. Sorry, sorry, Mr. Gordieri, if I could just – sorry about that. Just keep on thinking, if I could just understand why they're on this side, maybe I would understand this whole case better. So I'm giving you, like, please help me. Is there a policy reason you're on this side? Sure, let me see what I can do there. The principle that we are here to vindicate, which is that uniform limitations on coverage for renal dialysis do not themselves constitute impermissible differentiation, is a principle that is reflected in the regulations that CMS, the expert agency charged with administering the statute, has enacted, and that's Section 161C in Part 411. The position that we are taking here is the one that is most consistent with the agency's longstanding regulations. Now, as to the broader question about, you know, wouldn't it be in the government's best financial interest for there to be, you know, circumstances in which group health plans could be compelled to pay higher rates to dialysis providers, you know, I don't – I think part of the story there is that Congress has, in general, in this statute, chosen not to create an entitlement to dialysis coverage. That's consistent with Congress's overall choices in this area. In particular, ERISA, which is the preeminent federal law regulating the design of health benefits plans, does not mandate that plans cover particular services, and that's true even with respect to ERISA's nondiscrimination provision. And we think this statute fundamentally operates in the same way as that. It does not forbid uniform limitations on particular services. That is a policy decision that Congress made here. It's the decision that – it's a policy that is reflected in the secretary's regulations, and that's why we have chosen to support the petitioners in this case. Now, you know, again, we have filed in support of reversal, not actually in support of petitioner's brief, because we have policy concerns that plan practices like this could ultimately lead to greater costs for the Medicare program and potentially worse coverage or worse options for individuals with end-stage renal disease. We just don't think the statute in its current form prohibits the particular plan provisions that are under scrutiny here. Could I ask you the question that I asked the petitioner about whose financial interests are at stake here? And I'm particularly concerned about the patients with end-stage renal disease. He said that an affirmance here would work against their financial interests. Is that correct? It's hard to predict with certainty how that would play out, Justice Alito. I take petitioner's point to be that an affirmance, meaning that this plan was obligated to reimburse respondents, that respondents' undiscounted rates would mean that an individual's co-insurance obligation, which under this plan is 30 percent of whatever the plan's reimbursement rate is, would skyrocket because they would be required to pay 30 percent of the undiscounted rate. The other point that petitioners and their amici have made is that because the Medicare secondary payer statute itself does not require that group health plans provide coverage for renal dialysis, a decision respondents favor might mean that more group health plans choose not to cover dialysis at all, if the result of covering that would be exposing them to liability under the statute. It's really difficult to predict with any certainty what would happen there. Certainly, as I said before, Medicare is a backstop here. The Medicare Part B monthly premium is $170. That's a pretty reasonable amount. Individuals who are concerned that their group health plans may provide insufficient coverage for their dialysis needs during the coordination period can enroll in Medicare as the secondary payer. And even in that circumstance, that's going to save Medicare money in the sense that, you know, if you take a situation in which the group health plan provides a relatively parsimonious coverage for outpatient dialysis and an individual makes a decision to enroll in Medicare as the secondary payer during the coordination period, the group health plan is still covering all of that individual's other medical expenses, and that's going to save Medicare money. Medicare only steps in as the secondary payer with respect to items or services that the group health plan does not fully cover. And, you know, that's sort of another cost-saving feature of the statute, irrespective of the dialysis issue. Could I ask you to follow up a bit on what you said about workability? This is basically a sort of a discrimination, anti-discrimination statute. In an anti-discrimination statute, you have to compare people in one group with people in another group. I understand how it works under your theory. It is a bit strange that the two groups are almost identical, but if it's interpreted the way the Sixth Circuit interpreted it and the way Respondent interpreted it, you have the people who have end-stage renal disease and they need kidney dialysis, and the plan pays a certain amount of money to them for that service. What do you compare that to? I entirely agree with Justice Bluto. I don't think Respondent very clearly answered that question, and as Judge Murphy explained in his partial dissent in the Sixth Circuit, the Medicare secondary payer statute itself does not provide guideposts for making that kind of judgment. There is no kind of obvious comparator in terms of if it were a viable theory under the statute to say that you can't treat dialysis itself differently than some other services, what are those other services? Respondents have never said. And so I do think that their view would give rise to substantial practical problems. Thank you. Thank you. Justice Thomas, anything further? Justice Breyer? Justice Alito? Thank you, Mr. Guarnieri. Thank you, Mr. Chief Justice. Mr. Waxman? Mr. Chief Justice, and may it please the Court, differential treatment of outpatient renal dialysis is most certainly differential treatment of individuals with ESRD. Congress determined that, and it determined it because Congress understood in 1972 and in 1981 and thereafter that ESRD patients uniquely and utterly need outpatient dialysis for the rest of their lives. And a plan whose purpose, as alleged here, and effect is to move primary coverage of ESRD patients to Medicare is one that most certainly, quote, takes into effect those patients' eligibility for Medicare. The reading urged by the petitioners and the Solicitor General, by which the anti-discrimination provision bars only plans that single out ESRD patients by name and the take-into-account provision only applies to plans that reference Medicare eligibility expressly, renders both of these statutory protections utterly toothless. And in each respect, their reading violates the text of the statute. Take the anti-discrimination, the anti-differentiation provision, which has occupied, I think, virtually all of the arguments so far. That provision protects ESRD patients by prohibiting differential treatment either by express reference to ESRD patients or by proxy. The particular proxy codified in the statute, and the one that is relevant here, expressly prohibits differential treatment, quote, on the basis of the need for renal diagnosis, a treatment that Congress has long understood to be completely inseparable from ESRD itself. Ninety-nine and a half percent of all of DaVita's outpatient dialysis patients have ESRD. There is simply no reasonable argument for singling out outpatient dialysis as anything but differential treatment of individuals with ESRD. And as was noted, I think by Justice Sotomayor, even the Ninth Circuit in Amy's Kitchen agreed, and I'm quoting from the opinion, a plan would violate the MSP if it provided differential coverage for routine maintenance dialysis. That is, dialysis received only by persons with ESRD than for all other dialysis. That is exactly what this plan does. Now, as I know that I'm trenching on my two minutes, but please interrupt me, but I just wanted to reference the fact that as has been mentioned by several members of the court, there is another provision that is on the basis of either ESRD, calling it out by name, or the need for renal dialysis or any other manner. And that's because, as I think Justice Kagan's question suggested, Congress understood at the time that other proxies for ESRD might exist or more likely might come to exist with medical advances. And so the statute also prohibits differentiation on any other manner, which in context should be understood to mean in any other manner that in effect singles out a treatment for ESRD. I want to clarify just a couple of, I think, errors that my friend on the other side made. The notion that they are actually helping beneficiaries because they are limiting the amount of balance billing available is utterly wrong. One of the main reasons that renal dialysis is disadvantaged here is that the plan says unilaterally there is no in-network service for this. If there were in-network service, as there is for virtually all employment group plans in the United States, this is an extreme outlier. There's no balance billing at all. If there was an in-network option, and this goes to, I think, Justice Alito's questions about who's harmed. If there was an in-network option, there would be no balance billing, and patients would have a right to treatment. They would have a right to treatment by somebody who was in-network. Right now, they don't, and as there are some really terrific and very knowledgeable amicus briefs filed in this case, it is completely clear, and Congress has understood, that if this court accepts the other side's ruling, there is no reason on God's green earth that UnitedHealth and Aetna and all the big health plans and big, big employer health plans, all of whom do not differentiate in any basis on the need for renal dialysis, I mean, they have shareholders. Of course they're going to do it. I don't understand how your approach would work, but I assume you'd be able to explain it to me. So suppose the plan says that we will pay a maximum of X dollars, let's say $1,000 per year for renal dialysis, period. Is that vulnerable? I'm sorry, is that what? Is that vulnerable? Is that illegal in your view? So the answer is it depends. If what the plan says is for all other forms of, you name it, treatment, medical treatment, chronic medical treatment, we will pay the customary, ordinary, and reasonable cost, except for renal dialysis, that's a differentiation that's prohibited by the statute. If you have what's called a skinny plan, which is a plan that says, you know, we're going to provide for regular checkups, et cetera, et cetera, but we provide no benefits for chronic health care. Well, what if they do something like I understand Medicare does, so they have a certain amount for different conditions. They go by the Medicare code. They provide a certain amount for different conditions, so they distinguish among, discriminate among different medical conditions, and they pay different amounts for different medical conditions. So, Justice Alito, there's no doubt that different medical treatments require different amounts. Yeah, so how do you compare? Maybe they're being very stingy with renal dialysis as compared to other. I just don't know what the standard is for making the comparison. So I think you've just identified the standard, which is if there is a differentiation on the basis of the need for renal dialysis, a differentiation with, and we can talk about what the relevant comparators are, there is a violation. Now, in this case, there's no dispute about the relevant comparators. This plan, as is plausibly alleged in the complaint, and I don't think there's really any dispute, but if there were, it would be developed when, and I hope, the order dismissing the complaint is reversed. I've lost my thought for a minute. Who are you going to compare it with? Yeah, so here, there's no doubt whatsoever that outpatient renal dialysis, that is maintenance dialysis, the dialysis that ESRD patients alone need to survive to the next day for the entire rest of their lives, is treated worse in a number of respects than any other treatment. So this might be an easy case, but I think what Justice Alito is sort of suggesting to you is let's take a case where there are five different chronic health conditions and the plan sets up a payment scheme for each of the five. And it's like, well, you know, it's not as though four of them, they say, will pay the reasonable costs and the fifth will pay $500. You know, they put different price tags on each. What are you supposed to do? So I think what are you supposed to do is the same thing under our reading of the statute or the other side's reading of the statute. What if the statute said instead, let's take an example, we're going to pay everybody, we're going to pay the ordinary reasonable cost for everything except heart disease, you know, congestive heart failure and ESRD. Congestive heart failure and renal dialysis. The treatments that are needed for congestive heart failure and the treatment that is needed for ESRD. You can say, well, does that differentiate or doesn't it differentiate? I mean, I would say in that situation it probably doesn't differentiate, but the salient point to your question and Justice Alito's question is that they have the same problem in their reading of the statute. In their reading of the statute, they say, well, look, you can forget the last 18 words of the statute. All you have to know is whether it differentiates on the basis of people who have ESRD. So what if the plan said, okay, people who have ESRD and people who have congestive heart failure or people who have cancer get a lower level? It's the same comparator problem. No, it isn't. What they're saying, I think now, I hope, because I've had a hard time with this. Okay. I think they're saying imagine, or at least this is close, there are 5,000 members of a plan. They each have a piece of paper which describes the whole plan. In this piece of paper, it says ESRD outpatient, and it is identical. Whether you have the disease, whether you don't have the disease, you might get the disease, maybe you had it and it wasn't paid for, but anybody who has it or gets it or whatever it is will be paid identically. That's the end of the case. Yeah, I agree. That's good. At least I've got that right. Then what you are saying, it seems to me, is we look at that piece of paper and we see everybody is getting the same. People with heart conditions, something different. People with colds, something different. Inpatient people where you add to the bill normally about $2,000 a day for hospital overhead are paid something different. And lo and behold, that's what you want us to look at. And what the bill is, if that's so, what goes off in my head is you are substituting for people who make decisions as to cost, several thousand judges who know far less about it than IHSS, than anyone else in the medical world. And it covers all the diseases, and it seems to me, nightmare. Now, that's what I'm worried about, and I ask it so I see your answer. This is in no way does applying this statute as we read it, and I do want to continue on the comparator issue, because I gather that's something that you also are concerned about, but I do want to come back and underscore why their reading of the statute renders exactly one half of the words of the statute complete surplusage and renders this statute utterly toothless. I'm not interested at the moment in the toothless. I understand. I'm interested in the chaotic. The point about the comparator is in a case like this where we allege, and our complaint was dismissed, that renal dialysis and outpatient renal dialysis are treated uniquely disadvantageously. Compared to? Compared to any other treatment. Or you can introduce evidence, whether it's this one, compared to heart attack patients. Yeah, absolutely. There's not going to be any argument about that. Then how do you avoid, if not this case, in the mine run of cases, of people bringing nonstop cases where the judge has to look at heart attacks, inpatient diagnostic facilities. We could go on for about 10 months listing all the other things. Justice Breyer, I would do it in any number. The first way I would do it is to say, is the allegation here represent a differentiation of ESRD patients on the basis of their need for renal dialysis? There are a lot of other provisions that aren't. Now, is there a differentiation? If there are various costs associated with various treatments, the complaint doesn't even satisfy the Twombly standard. But my ultimate point is that it doesn't matter whether you're focusing on, well, what about this treatment or what about that treatment. They have the same problem if you're saying for people with ESRD or people with diabetes or people with congestive heart failure, you get X, but for people who have hearing loss, you get Y. It's the same. You can't avoid a comparator problem. The problem is resolved by a court. Dr. Wexman, if Justice Breyer is correct and we have a comparator problem, as you call it, I think you indicated earlier that you think it would be solved from the hospital's perspective if they had given similarly limited benefits for congestive heart failure, then they would win. Right. In that instance, yes, in that instance, we would have to show that the addition of congestive heart failure, which I think would be hard, but let's say they say, you know, you get the same thing for sleep apnea, the same disadvantageous treatment. The burden would be on us if there were disadvantageous treatment of a host of medical treatments. The burden would be on us to plausibly allege and then prove that those were, in essence, a sham. Okay. And what incentive structure does that create? Might that encourage health plans to provide more parsimonious limits for other similar chronic diseases? So I think not, and I'll say one reason is historical and the other is logical and, I suppose, political with a small p. These plans have been, this anti-differentiation provision has been around for 31 years. This and the plan in Amy's Kitchen and a few other ones are utterly Well, both sides can talk about the fact that the history is on their side, and I'm asking you to put that aside for the moment. Okay. You indicated that if a plan could show that it was equally parsimonious with respect to congestive heart failure, it would prevail. I would think that would be a suggestion to plans, that that's exactly what they should do, and should we worry about that? You know, I really think you don't need to worry about this, not only for historical reasons, but also because it is only ESRD patients who are immediately eligible after three months, regardless of age, for Medicare. That raises another question I had, actually, and that is, you know, I understand any discrimination law to protect patients, but I'm not familiar with one that this court's encountered before that would only protect a public FISC. Well, there's no doubt that one of the two objectives of this statute was, in fact, to protect the public FISC, to avoid payers paying secondary to Medicare as soon as the patient's enrolled. So whether you call this a differentiation statute or a discrimination statute, everybody agrees that was one of Congress's objectives. Congress, and this is clear from the fact that the antidiscrimination provision was enacted at the same time that the secondary... But we'd agree, I think, wouldn't we, that the only thing that the outcome of this case is how soon Medicare will wind up paying for these services? That's right. And Congress was very well aware, and it's explicated in several of the amicus briefs, Congress has been expressly aware that the only way that an outpatient dialysis system in this country of private medicine can survive is if the 10% of dialysis treatments that aren't covered by Medicare are the result of a negotiation between the providers and the plan. If the beneficiary of the antidiscrimination principle is supposed to be the public FISC, then, what should we make of the fact that the government is on the other side of the V in this case? I mean, I think you've... If they're the beneficiary of the discrimination principle, you're asking us to adopt. So they aren't the beneficiary. They are one of the two beneficiaries, and I'll address the second layer. Well, we agree that the patient's going to receive the services under Medicare, right? It's just a matter of who pays and when. Let me first address the perplexing question of why the government is on the other side. Why don't you answer that question first? We agree that the only question is who pays and when, right? The only question is who pays and when and how much, excuse me... And how much your company gets.  No, no, no, I'm sorry. But if you could just... With respect... Counsel, please. Okay. If it's who benefits, if the only question is who pays and when, the beneficiary is government's FISC, why shouldn't we take account of the fact that the government's on the other side of the V? How do we handle that? Well, I think Mr. Guarneri has told you in his argument that the government is on the other side because it feels some duty to defend one particular sub-provision of its regulations, which, as our briefs explain, is inconsistent with both the statute and the provision that immediately precedes it. He has said in his brief and today here that the government is quite troubled by what this plan is trying to do and it acknowledges that there very likely will be an adverse financial effect on the Medicare FISC if the court reverses and adopts the reading of the statute that Judge Murphy provided in dissent below. But here is... And I apologize if I was wrangling with you, but I was objecting to your suggestion, which I know you don't mean, but I had heard it mistakenly, that the only people who are harmed here are possibly the Medicare FISC and my company, or the companies. The harm here, and this is probably laid out as well as anywhere by the amicus brief of the Dialysis Patients Coalition, which is 30,000 dialysis ESRD sufferers who explain all the ways in which the provisions of this plan harm people. Now, you can say that this is just a payment dispute, but it's not. The core benefit that these plans provide is payment for medical services, and there's real harm, number one, that there is no, uniquely for this service, there is no in-network available. So there is no provider who has agreed not to balance bill and who has guaranteed that you can get treatment. It requires higher copays and deductibles, up to $7,000 a year. It doesn't provide any relief whatsoever for the first three months in which there is no Medicare backstop. And you can say, oh, well, this is the Medicare Secondary Payer Act. You can always enroll in Medicare Secondary. The government says that's an extra $170 a month, which is, by the way, the minimum. It is certainly not applicable to everybody. You pay Medicare $170 a month or $250 a month, and you can get this secondary coverage. This is in addition to what these people of limited means and who are facing end-of-life worries are already paying to the group health plan. And if they can't reasonably afford to pay two sets of benefits, they do what patient A did in this case. Mr. Waxman, isn't it true that your company and another company control around 89% of the market for dialysis? I don't know the numbers, but there are essentially two large players and then several other players. And the reason that that exists, nobody... I mean, to my knowledge, there's never been an antitrust complaint filed against these companies. And if Marietta Memorial or MedBend had some claim that they were, you know, refusing to negotiate in good faith or agree to a reasonable price, there are plenty of causes of action. The reason that it exists, and I think my friends on the other side agree, is because Congress has chosen to, for purposes of Medicare or Medicare, CMS has chosen to reimburse the centers at less than the actual cost of providing the service with the understanding that in a few instances, that is, the 10% of people who get outpatient dialysis, they operate under negotiated in-network plans with the provider. Well, the statistic I have is that your average cost per treatment is $269 and you charge, on average, $1,041. Is that right? Well, it's $290, as we explained in our brief, and the average price that we charge is $1,000. I mean, this has been well known to Congress for over 30 years. This is how CMS has chosen to allow the dialysis industry to stay in business. If what happens is that you reverse and plans widely can do what this plan has done, there are going to be hundreds or thousands of dialysis centers. Mr. Waxman, I understand you're attacking the low rates this group plan provides for dialysis, and one can make strong arguments about that, but even if a group plan agreed to reimburse at 200% of Medicare rates, $500, your company would still reserve the right to balance bill for the other $500, say, right? Yes. In other words, the differentiation here, Justice Gorsuch, doesn't depend on the fact that they pay 87.5% of the already low Medicare. So really, the scope of their payment plan isn't relevant to your argument. The scope of their payment plan is our argument. You'd still reserve the right to balance bill for whatever difference there were, right? We would still reserve the right to balance bill, and as counsel has pointed out, we don't cut off life-saving treatment because people can't pay the difference. We don't, in fact, balance bill. People who come to our centers sign an agreement saying they're responsible for the balance, but people who can't afford it don't get billed. So the question is not a loss of coverage unless the interpretation that Judge Murphy in dissent provided becomes the law of the land, in which case there are going to be for-profit dialysis centers in many, many, many communities in the United States. It is already only the ones that can be the most ruthlessly efficient and have economies of scale that even operate. That's why there are two predominant companies here. I mean, if I can just go to what... Counsel, just one question in what you just said about this. How do you decide who can afford this treatment? I'm sure there are plenty of people with means who come in and say, I can't afford it. Do you just accept their word? So are you really accepting whatever people are willing to pay? Justice Sotomayor, you know, these are actually facts not in the record, and they're actually facts I don't know the answer to. I'm just curious. I do see your argument, however, that if every other provider does this and is paying just whatever the average cost might be, because they're charging 125% of Medicaid, paying 125 for Medicaid, that for many providers, if it's a uniform now that nobody's going to pay much, that many of the providers just have to go out of business, correct? There's no question about that. I mean, if you look, for example, not only at the Kidney Care Partners amicus brief, but also the brief of former CMS Administrator Scully, he explains why that's the case. Now, I do want to go, just before my time runs out, whenever that will be, to explain, because there are a lot of questions asked of my friends about the text, and I fully endorse the, quote, questions or reading of the statute that Justice Kagan provided. But I think it's unimportant. You're off on another, not my question, correct? Oh, I'm sorry. I answered your question, which is I don't know the facts. There is simply no, under their reading of the statute, which is you just look and see whether it calls out ESRD, and if it provides the same benefits, whatever they are, you know, ingrown toenails and whatever to ESRD patients as to other, the statute ends. You don't even need to read the last 18 words of a 36-word provision. Neither the petitioners nor the United States has given any content to explain what content there can be to the rest of it if the first one simply means if you discriminate against ESRD patients by name, that's illegal, and if you don't, that's not illegal. But what this provision says, and I think here, you know, it's really important in their reply brief the petitioner says, look, what they wanted was parity. They wanted parity between ESRD patients. They wanted them to have the same benefits, whether you have ESRD or not. The text completely refutes that. First of all, a few lines above is the provision about, that deals with people over 65, and it says, number one, you can't take into account the fact that they're eligible for Medicare, which is the same as the take into account provision here, and second, it says you must provide, people over 65 shall be entitled to the same benefits under the same conditions as any other individual under age 65. That's not what this provision, what our provision says. What our provision says is you can't differentiate on the benefits you ESRD and other individuals covered by the plan on the basis of, and then it explains what it means to differentiate. On the basis of express. You can't do it, you can't call it out by name. There is a statutory proxy. You may not do it on the basis of the need for renal dialysis, and you may not do it in any other manner that serves as a proxy for what ESRD patients uniquely need. That reading of the statute, Justice Kagan's reading of the statute, gives meaning to every word of the statute. The government's reading and the petitioner's reading gives no meaning whatsoever. The one example the government was able to come up with in its brief, which is some plans may give greater benefits based on tenure, and people with ESRD may be older, fails because a plan that gives higher benefits based on tenure doesn't even meet their test for the first part of the clause. It's not differentiating on the basis of ESRD. The anomaly in this case, and I would be interested in MedBend's lawyer response to this, is as we allege in the complaint, MedBend, which is the plan administrator, and this little consulting firm that's come up with the language that was imposed by this plan, it expressly touts the benefit of its ability to reduce dialysis procedures provided to ESRD patients. By implementing our proprietary dialysis health plan language. And in this case, it is here trying to deny that that is what its plan does. Justice Thomas, any further? Justice Breyer? Okay. Thank you, Counsel. Thank you very much, Your Honor. Rebuttal, Mr. Kulowitz? Thank you, Mr. Chief Justice. Four brief points, please. First, in response, in further response to Justice Alito's question about the network, it does, of course, take two to network. The VITA never tells you, it never says either on the record or even up to today that it wants to come into the network. What it seeks is the right to be paid at its undiscounted charges. That would destroy any incentive to come into network. It would have obviously the catastrophic effect upon patients and the plans that we've discussed. Justice Breyer, in response to your ongoing search for a comparator, we still have not heard one. We don't have a comparator in the brief of the respondents. We've not heard one today. What comparator, if we say that there is disparate impact and it should be equal, the question is equal to what? We haven't seen it in the briefs. We still don't see it today. My friend indicated that this cost containment measure of the plan is unique to the plan. But if the court will look at any from pages 52 through 92 of the joint appendix alone, there are 10 other examples in there, including five other out-of-network situations that the plan addresses, one other reference-based price that the plan uses, and four extraordinarily costly surgical centers that are completely excluded from the plan. These don't have anything to do with dialysis, but the point that I want to make is that dialysis is not the only situation that is a cost containment function here. And then finally, in response to Justice Sotomayor's question about what would happen to plans, plans, of course, I'm sorry, what would happen to providers? Providers, of course, have gone to Congress before to get an increase in the Medicare rate. They are still able to do that. And if the court were to reverse, as we are asking in this case, and enter final judgment in favor of petitioners on all claims, perhaps that will give respondents the incentive to negotiate a network rate that is fair and reasonable. Thank you, Your Honor. Thank you, counsel. Thank you, Mr. Garnieri. The case is submitted.